UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


## CIVIL MINUTES – GENERAL

| | | | |
|---|---|---|---|
| Case No. | LA CV18-04100 JAK (AGRx) | Date | November 5, 2018 |
| Title | William G. Silverstein v. Keynetics, Inc., et al. | | |

---

Present: The Honorable     JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

| Andrea Keifer | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:**      **(IN CHAMBERS) ORDER RE PLAINTIFF'S MOTION TO REMAND (DKT. 21)**


## I.    Introduction

On April 2, 2018, William Silverstein ("Plaintiff") brought this action in the Los Angeles Superior Court against Keynetics Inc. ("Keynetics"), Click Sales Inc. ("Click Sales") (collectively, "Defendants"), and Does 1 through 50.[1] Dkt. 2-2. On April 10, 2018, Plaintiff filed a First Amended Complaint ("FAC" (Dkt. 2-3)). The FAC presents two causes of action: (i) violation of Cal. Bus. & Prof. Code § 17529.5(a)(1) and (ii) violation of Cal. Bus. & Prof. Code § 17529.5(a)(2). On May 16, 2018, Defendants removed the action on the basis of diversity jurisdiction. Notice of Removal ("Removal"), Dkt. 2.

On June 18, 2018, Plaintiff filed a motion to remand ("Motion" (Dkt. 21)). Defendants filed an opposition. Dkt. 26. Plaintiff filed a reply, and Defendants filed a sur-reply. Dkts. 27, 31.

A hearing on the Motion was held on October 15, 2018, and the matter was taken under submission. For the reasons stated in this Order, the Motion is **DENIED**.

## II.    Background

Plaintiff is a citizen of California who is a software developer. FAC ¶¶ 7, 11. Plaintiff works as an electronic mail service provider. Id. ¶ 9. Plaintiff owns, leases and maintains computers and other equipment that process electronic mail messages and allow registered users to exchange messages with others. Id. ¶ 8.

Defendant Keynetics and Defendant Click Sales are Delaware corporations whose headquarters are located in Boise, Idaho. Declaration of James Bird ("Bird Removal Decl."), Dkt. 2-1 ¶ 2; Dkt. 26 at 3. Click Sales is a privately-held, wholly-owned subsidiary of Keynetics. Bird Removal Decl., Dkt. 2-1 ¶ 2. Click Sales "operates ClickBank, an online marketplace and affiliate marketing platform on which third party creators of digital goods, such as electronics books . . . and videos, can list their products for sale." Id. Customers can view and buy products on the ClickBank website, and Click Sales processes the

---

[1] A prior Order dismissed Does 11-50 pursuant to Local Rule 19-1. Dkt. 12.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-04100 JAK (AGRx) | Date | November 5, 2018 |
| Title | William G. Silverstein v. Keynetics, Inc., et al. | | |

transactions. *Id.* Third party creators may also "list their products on ClickBank's affiliate marketplace," which third party affiliates can access to promote the products outside of ClickBank. *Id.* ¶ 3. The third party affiliates can post digital links on other websites, which take customers to the product page on ClickBank's website. *Id.*

Plaintiff alleges that 73 unsolicited, commercial e-mail messages ("spam") were transmitted to him between June 26, 2017 and March 29, 2018. FAC ¶¶ 1, 22.[2] Plaintiff alleges that those spam messages were transmitted in violation of Cal. Bus. & Prof. Code §§ 17529.5(a)(1) and 17529.5(a)(2). *Id.* ¶¶ 63-82.

The FAC alleges that all 73 spam messages were sent by the same person. *Id.* ¶¶ 56, 61-62. The FAC identifies the sender as "ac8media" and as "gmarket7." *Id.* The FAC alleges that the sender is an affiliate of Defendants, who are strictly liable for the actions of their affiliate. *Id.* ¶¶ 2-5. The FAC alleges that each message included a legitimate public personality's domain name without permission and that the "from" lines of each message contained falsified, misrepresented or forged information in violation of Cal. Bus. & Prof. Code §§ 17529.5(a)(1) and 17529.5(a)(2). *Id.* ¶¶ 63-82.

Plaintiff seeks injunctive relief, statutory damages of $1000 per spam message pursuant to Cal. Bus. & Prof. Code § 17529.5 and attorney's fees and costs. *Id.* at 10. As to the injunctive relief, Plaintiff seeks "[a]n Order of this Court enjoining Defendants, and each of them, and their agents, affiliates, servants, employees, and all persons acting under, in concert with them, from sending misleading commercial e-mail to Plaintiff or to Plaintiff's servers." *Id.*

## III.   Analysis

   A.   Legal Standards

        1.   Recovery Pursuant to Cal. Bus. & Prof. Code § 17529.5

Cal. Bus. & Prof. Code § 17529.5 provides for recovery of either or both of:

   (i) Actual damages.
   (ii) Liquidated damages of one thousand dollars ($1,000) for each unsolicited commercial
        e-mail advertisement transmitted in violation of this section, up to one million dollars
        ($1,000,000) per incident.

The statute also provides that "[t]he recipient, an electronic mail service provider, or the Attorney General, if the prevailing plaintiff, may also recover reasonable attorney's fees and costs." Cal. Bus. & Prof. Code § 17529.5(b)(1)(C).

        2.   Removal and Remand

A motion to remand is the procedural means to challenge the removal of an action. *Moore-Thomas v.*

---

[2]  The opening paragraph of the FAC states the relevant date range as "November 22, 2018 and March 29, 2018"; however, that statement appears to be an error. Thus, only the date range stated in the "Facts" section of the FAC is referenced here.

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-04100 JAK (AGRx) | Date | November 5, 2018 |
|---|---|---|---|
| Title | William G. Silverstein v. Keynetics, Inc., et al. | | |

*Alaska Airlines, Inc.*, 553 F.3d 1241, 1244 (9th Cir. 2009). In general, a state civil action may be removed only if, at the time of removal, it is one over which there is federal jurisdiction. 28 U.S.C. § 1441(a). Because federal courts are ones of limited jurisdiction, the removal statute is strictly construed, and any doubt as to the appropriateness of removal is resolved in favor of remand. *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992). Thus, the removing party has the burden of establishing that removal is proper, including that there is federal jurisdiction over one or more of the claims. *Id.* "If a case is improperly removed, the federal court must remand the action because it has no subject matter jurisdiction to decide the case." *ARCO Envtl. Remediation, L.L.C. v. Dep't of Health & Envtl. Quality of Mont.*, 213 F.3d 1108, 1113 (9th Cir. 2000) (internal citations omitted).

   3. <u>Diversity Jurisdiction</u>

Federal courts have diversity jurisdiction where the amount in controversy exceeds $75,000 and the adverse parties are citizens of different states. 28 U.S.C. §§ 1332, 1441. Complete diversity of citizenship is required, *i.e.*, "the citizenship of each plaintiff [must be] different from that of each defendant." *Hunter v. Philip Morris USA*, 582 F.3d 1039, 1043 (9th Cir. 2009).

Generally, "[i]f removal of a civil action is sought on the basis of [diversity jurisdiction], the sum demanded in good faith in the initial pleading shall be deemed to be the amount in controversy." 28 U.S.C. § 1446(c)(2). However, where the initial pleading seeks nonmonetary relief, the notice of removal may assert the amount in controversy. *Id.* Removal is proper on the basis of an amount in controversy asserted in the notice of removal "if the district court finds, by the preponderance of the evidence, that the amount in controversy exceeds the [statutory requirement]." *Id.*; *see also Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir. 2003) ("Where it is not facially evident from the complaint that more than $75,000 is in controversy, the removing party must prove, by a preponderance of the evidence, that the amount in controversy meets the jurisdictional threshold.").

Courts in the Ninth Circuit apply the "either viewpoint" rule to determine the amount in controversy. *In re Ford Motor Co./Citibank (S.D.), N.A.*, 264 F.3d 952, 958 (9th Cir. 2001); *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 405 (9th Cir. 1996). "Under the 'either viewpoint' rule, the test for determining the amount in controversy is the pecuniary result to either party which the judgment would directly produce." *In re Ford*, 264 F.3d at 958. "In other words, where the value of a plaintiff's potential recovery . . . is below the jurisdictional amount, but the potential cost to the defendant of complying with the injunction exceeds that amount, it is the latter that represents the amount in controversy for jurisdictional purposes." *Id.*

"The amount in controversy may include damages (compensatory, punitive, or otherwise) and the cost of complying with an injunction, as well as attorneys' fees awarded under fee shifting statutes." *Chavez v. JPMorgan Chase & Co.*, 888 F.3d 413, 416 (9th Cir. 2018) (internal quotation marks and citation omitted); *see also Galt G/S v. JSS Scandinavia,* 142 F.3d 1150, 1156 (9th Cir. 1998) ("We hold that where an underlying statute authorizes an award of attorneys' fees, either with mandatory or discretionary language, such fees may be included in the amount in controversy."). "In assessing the amount in controversy, [courts] may consider allegations in the complaint and in the notice of removal, as well as summary-judgment-type evidence relevant to the amount in controversy." *Chavez*, 888 F.3d at 416.

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-04100 JAK (AGRx) | Date | November 5, 2018 |
|----------|--------------------------|------|------------------|
| Title | William G. Silverstein v. Keynetics, Inc., et al. | | |

4. <u>Article III Standing</u>

"Standing is an essential component of the case or controversy requirement of Article III, § 2 of the United States Constitution." *Am. Civil Liberties Union of Nevada v. Lomax*, 471 F.3d 1010, 1015 (9th Cir. 2006) (internal quotation marks and citation omitted). "To satisfy Article III standing, the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1042 (9th Cir. 2017) (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)) (internal quotation marks and alteration omitted). "A plaintiff establishes injury in fact, if he or she suffered '"an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."'" *Id.* (citing *Spokeo*, 136 S. Ct. at 1548).

"For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548. "[A] plaintiff does not automatically satisfy the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. Even then, Article III standing requires a concrete injury." *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1112 (9th Cir. 2017), *cert. denied,* 138 S. Ct. 931 (2018) (internal quotation marks, citations and alteration omitted). "To establish such an injury, the plaintiff must allege a statutory violation that caused him to suffer some harm that actually exists in the world; there must be an injury that is real and not abstract or merely procedural." *Id.* "[A]n intangible harm may qualify as an injury in fact." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 982 (9th Cir. 2017). "In determining whether an intangible injury is sufficiently concrete, both history and the judgment of [the legislature] play important roles." *Id.*

Because the standing requirements "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). However, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.*

B. Application

Plaintiff argues this action should be remanded for three reasons: (i) the amount in controversy is less than $75,000; (ii) removal was procedurally deficient; and (iii) Plaintiff lacks Article III standing. These issues are addressed in that sequence.

1. <u>Whether There Is Diversity Jurisdiction</u>

As noted, diversity jurisdiction requires that the amount in controversy exceeds $75,000 and the adverse parties are citizens of different states. 28 U.S.C. §§ 1332, 1441. The parties do not dispute diversity of citizenship. Removal, Dkt. 2 ¶ 7-8; Motion, Dkt. 21 at 3. Plaintiff is a citizen of California. FAC ¶ 7; Removal, Dkt. 2 ¶ 8. Defendants are citizens of Delaware and Idaho. FAC ¶ 14-15; Removal, Dkt. 2 ¶ 8. Thus, the diversity of citizenship requirement is satisfied.

The parties also do not dispute that Plaintiff seeks $1000 in statutory damages for each of 73 alleged spam messages, and that Cal. Bus. & Prof. Code § 17529.5 provides a basis for such recovery. Removal, Dkt. 2 ¶ 10; Motion, Dkt. 21 at 2, 4. Therefore, the statutory damages sought by Plaintiff total $73,000. *Id.*

| Case No. | LA CV18-04100 JAK (AGRx) | Date | November 5, 2018 |
|----------|--------------------------|------|------------------|
| Title | William G. Silverstein v. Keynetics, Inc., et al. | | |

Thus, the issue is whether there is a basis for an additional $2000.01 in controversy. Motion, Dkt. 21 at 2, 4-7.

Plaintiff seeks injunctive relief in addition to statutory damages. Specifically, Plaintiff seeks "[a]n Order of this Court enjoining Defendants, and each of them, and their agents, affiliates, servants, employees, and all persons acting under, in concert with them, from sending misleading commercial e-mail to Plaintiff or to Plaintiff's servers." FAC at 10. Plaintiff argues that compliance with the requested injunction would cost Defendants no more than $500 and that Defendants always had an obligation to comply. Motion, Dkt. 21 at 6-7. Defendants argue that such compliance would cost at least $5000, and dispute that they have any obligations that arise out of the actions of those who use their sites and services. Removal, Dkt. 2 ¶ 12. Defendants also argue that Plaintiff will incur at least $2651 in costs related to this action, including a $435 filing fee for filing an unlimited civil case in the Los Angeles Superior Court. *Id.* ¶ 11. Plaintiff argues that his litigation costs should not be included in the jurisdictional calculation as a matter of law. Motion, Dkt. 21 at 4.

Defendants state that "[a]ny emails promoting products available on the Clickbank platform are sent outside the ClickBank platform without knowledge or control by Click Sales." Declaration of James Bird ("Bird Decl. 1"), Dkt. 2-1 ¶ 6; Declaration of James Bird ("Bird Decl. 2"), Dkt. 26-1 ¶ 4; Removal, Dkt. 2 ¶ 12. Consequently, Defendants contend that "[i]n order to comply with the injunction sought by Plaintiff, Click Sales would need to substantially modify its business and develop technology systems to ensure that commercial emails are only sent through the Clickbank platform. This would require purchasing additional servers, software for sending large quantities of email and screening such email to ensure legal compliance." Removal, Dkt. 2 ¶ 12; Bird Decl. 1, Dkt. 2-1 ¶¶ 6-7[3]; Bird Decl. 2, Dkt 26-1 ¶ 4. James Bird, Senior Vice President of Finance at ClickBank, "estimate[s] that the cost of obtaining the requisite equipment alone, not counting any personnel time, would exceed $5,000." Bird Decl. 1, Dkt. 2-1 ¶ 7; Removal, Dkt. 2 ¶ 12.

Plaintiff responds that Defendants need not spend any money to comply the requested injunction. Motion, Dkt. 21 at 5. Defendants could "[s]imply notify Defendants' affiliates and senders of the injunction terms by including those terms as part of the contractual terms of Defendants' web site and send an e-mail containing the same language to all of Defendants' their [sic] affiliates and senders." *Id.* Defendants reply that the ClickBank terms of service already contain an express prohibition on sending commercial spam in email communications. Removal, Dkt. 26 at 5-6; Bird Decl. 2, Dkt. 26-1 ¶ 3; Ex. A to Bird Decl. 2, Dkt. 26-2.

Defendants' argument has more force. It is highly unlikely that Plaintiff's proposal would successfully stop all affiliates of Defendants from sending spam messages to Plaintiff or Plaintiff's servers. *See* FAC at 10. The evidence instead supports the view that Plaintiff's cost-free proposal would not assure compliance with the requested injunction.

Plaintiff next argues that Defendants overstate the cost of implementing changes that will ensure compliance with their alleged statutory obligations. Motion, Dkt. 21 at 6-7. Plaintiff contends that the system described by Defendants in the notice of removal "could be built for less than $500.00." *Id.*;

---

[3] Plaintiff filed evidentiary objections to paragraph 7 of the declaration of James Bird, which was filed in support of the Removal ("Objections" (Dkt. 19)). The Objections are **OVERRULED**.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV18-04100 JAK (AGRx) | Date | November 5, 2018 |
| Title | William G. Silverstein v. Keynetics, Inc., et al. | | |

Declaration of William Silverstein ("Silverstein Decl. 1"), Dkt. 21-1 ¶¶ 19, 23. Plaintiff provides a declaration in which he describes how he would build such a system and the corresponding costs. Silverstein Decl. 1, Dkt. 21-1; *see also* Declaration of William Silverstein ("Silverstein Decl. 2"), Dkt. 27-1 ¶¶ 6-10. Plaintiff asserts that an alternative "approach would be to use a virtual private server from [one of] many different hosting services instead of a physical server." Silverstein Decl. 1, Dkt. 21-1 ¶ 25; *see also* Motion, Dkt. 21 at 7. Plaintiff states that one hosting service charges $9.99 per month, in addition to a $49 installation fee. Motion, Dkt. 21 at 7.

Defendants respond that Plaintiff lacks "insight as to Click Sales's business model, operations, infrastructure, and personnel," and therefore cannot "offer competent evidence as to the proper means by which Click Sales would implement the injunctive relief he seeks." Opposition, Dkt. 26 at 6. Defendants assert that compliance would require them to "expend significant resources to develop software, integrate technology, and expend personnel time to build and maintain the necessary infrastructure for rerouting commercial emails through the ClickBank platform." *Id.* at 8; *see also* Declaration of Christopher McClave ("McClave Decl."), Dkt. 26-3 ¶ 3. Defendants add that they would have to set up an email server that could process millions of emails per month, and that the email platform would need to "include[] specific features, including automation tools, analytics, CAN-SPAM compliance, A/B testing capabilities, e-mail list segmentation, templates, and tagging and tracking tools." *Id.* at 9; McClave Decl., Dkt. 26-3 ¶ 4. Defendants also claim that "any e-mail system must be customized and integrated with ClickBank's existing technology" and that using third-party software would not be a viable solution. Opposition, Dkt. 26 at 9; McClave Decl., Dkt. 26-3 ¶ 5. Defendants estimate it would take approximately four weeks "[j]ust to scope and plan" an e-mail rerouting system suitable to Defendants' business and sufficient to ensure compliance. McClave Decl., Dkt. 26-3 ¶¶ 6-7; Opposition, Dkt. 26 at 10. Defendants estimate the personnel costs for that task would amount to approximately $49,000.[4] *Id.* Defendants' "estimate does not include any of the effort to build that platform as outlined above, to hire the team to manage it, []or to pay for costs associated with the services . . . through which Click Sales purchases cloud infrastructure." McClave Decl., Dkt. 26-3 ¶ 7. Defendants assert that the stated costs "are conservative estimates." Opposition, Dkt. 26 at 10.

Defendants have shown by a preponderance of the evidence that the cost of compliance with the requested injunction would exceed $2000.[5] Defendants are better informed than Plaintiff to evaluate the

---

[4] Defendants state they would need to assemble "a team of various employees, including a Product Manager, two Development Leads, an Enterprise Architect, and a staff member from DevOps" to develop the system. Opposition, Dkt. 26 at 9; McClave Decl., Dkt. 26-3 ¶ 6. Defendants list the salaries of the requisite team members as follows: $1600 a week for a Product Manager; $2700 a week for a Development Lead; $3300 a week for an Enterprise Architect; and $2000 a week for a staff member in DevOps. Opposition, Dkt. 26 at 9-10; McClave Decl., Dkt. 26-3 ¶ 6.

[5] In Defendants' notice of removal, they also argue that, because Plaintiff seeks an award of costs and attorney's fees, litigation costs should be considered in calculating the amount in controversy. Removal, Dkt. 2 ¶ 11. At minimum, these costs would include the $435 filing fee required to bring this action. *Id.* Although costs are typically excluded from the amount in controversy, and Plaintiff here is self-represented, it is appropriate to consider costs where the underlying statute authorizes their award either with mandatory or discretionary language. *Galt G/S v. JSS Scandinavia,* 142 F.3d 1150, 1156 (9th Cir. 1998). Cal. Bus. & Prof. Code § 17529.5 is such a statute. *See* Cal. Bus. & Prof. Code § 17529.5(b)(1)(C). Thus, costs can be considered in calculating the amount in controversy in this action. However, because the amount in controversy exceeds $75,000, exclusive of costs, it is not necessary to consider them here.

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-04100 JAK (AGRx) | Date | November 5, 2018 |
|----------|--------------------------|------|------------------|
| Title | William G. Silverstein v. Keynetics, Inc., et al. | | |

current state of their technology and the requirements of a system that could be integrated with their existing technology, and would comply with the requested injunction. Plaintiff's expertise is not without value, but his estimates as to the cost of compliance warrant less weight. Also unpersuasive is Plaintiff's argument that these costs should not be included because Defendants have an independent statutory obligation that requires them. Defendants contest such a statutory obligation. Accordingly, it is appropriate to include these costs as part of the amount in controversy analysis.

Defendants have presented credible evidence that a suitable system would cost approximately $50,000 to develop and more to build and maintain. This is substantially greater than the $2000.01 necessary to meet the requisite jurisdictional amount. Therefore, Defendants have met their burden of showing, by a preponderance of the evidence, that the amount in controversy in this action exceeds $75,000.

### 2. Whether Removal Was Improper Due to Procedural Defect

Plaintiff also argues that the removal of this action was improper due to Defendants' alleged failure to comply with Local Rule 7.1-1. Motion, Dkt. 21 at 2; Reply, Dkt. 27 at 3-4. Local Rule 7.1-1 requires counsel to "file with their first appearance a Notice of Interested Parties, which shall list all persons, associations of persons, firms, partnerships, and corporations . . . that may have a pecuniary interest in the outcome of the case." The stated purpose of this requirement is "[t]o enable the Court to evaluate possible disqualification or recusal." L.R. 7.1-1.

Plaintiff argues that "the clear language of the Local Rule 7.1-1[] required Defendants to fully identify the affiliates identified, but not named, in the complaint" and that Defendants failed to do so. Reply, Dkt. 27 at 4. However, even if Defendants did not comply with Local Rule 7.1-1, this would not, as Plaintiff contends, "require[] this Court to remand this case." *See id.* This Court has discretion to excuse violation of the Local Rules. There is no clear connection between this Motion and the stated purpose of Local Rule 7.1-1, which concerns attorney disqualification or recusal. Nor has Plaintiff shown that the alleged violation of Local Rule 7.1-1 caused him prejudice. The alleged violation of Local Rule 7.1-1 does not warrant remand of this action.

### 3. Whether Plaintiff Has Article III Standing

Plaintiff next argues that, because he lacks standing under Article III, remand is required.[6] Reply, Dkt. 27 at 2-3. Plaintiff argues that he did not allege an injury in fact sufficient under Article III. *Id.* The FAC alleges only that Plaintiff received spam messages in violation of Cal. Bus. & Prof. Code § 17529.5 and that he "suffered damages as a result of Defendants' wrongful conduct." FAC ¶¶ 68, 82.

---

[6] Plaintiff filed a Request for Judicial Notice in connection with this argument ("Request" (Dkt. 35)). Plaintiff seeks judicial notice of an order in *Blanchard v. Fluent LLC*, No. 17-CV-04497-MMC, 2018 WL 437099 (N.D. Cal. Sept. 13, 2018). Pursuant to Fed. R. Evid. 201(b)(2), "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." A district court may take judicial notice of "undisputed matters of public record . . . including documents on file in federal or state courts." *Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012). Because the applicable standards have been met, and no objections have been made, the Request is **GRANTED**.

| Case No. | LA CV18-04100 JAK (AGRx) | | Date | November 5, 2018 |
|---|---|---|---|---|
| Title | William G. Silverstein v. Keynetics, Inc., et al. | | | |

Article III standing requires that the plaintiff have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Van Patten v. Vertical Fitness Grp.*, *LLC*, 847 F.3d 1037, 1042 (9th Cir. 2017) (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)) (internal quotation marks and alteration omitted). Plaintiff alleges that spam was transmitted to him by affiliates of Defendants, for whom Defendants are strictly liable. Plaintiff disputes only the injury-in-fact element of Article III standing. Plaintiff does not deny that an injury, if any, was fairly traceable to the challenged conduct of the defendants. Nor does Plaintiff dispute that redress can be achieved by a favorable decision in a judicial proceeding. Here that would consist of an award of damages and the entry of the requested injunction. There is no independent reason to question these bases for standing.

Plaintiff has also met the particularization prong of the injury-in-fact requirement. Plaintiff alleges that Defendants violated his statutory rights, not just the statutory rights of others. *See Spokeo*, 136 S. Ct. at 1548. In addition, Plaintiff's personal interests in being protected from improper spam are individualized. *See id.* He effectively conceded this point at the hearing, in acknowledging the aggravation caused to him because he received the spam. Thus, the only remaining issue is whether Plaintiff has met the concreteness prong of the injury-in-fact requirement.

"[A] plaintiff does not automatically satisfy the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. Even then, Article III standing requires a concrete injury." *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1112 (9th Cir. 2017), *cert. denied,* 138 S. Ct. 931 (2018) (internal quotations and alteration omitted). However, "*some* statutory violations, alone, do establish concrete harm." *Id.* at 1113.

Where a statute codifies a substantive right, a plaintiff need not plead any additional harm beyond a violation of the statute to obtain standing. *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017). The Ninth Circuit has found violations of the Telephone Consumer Protection Act (TCPA) and of the Video Privacy Protection Act (VPPA) sufficient *per se* to establish a concrete injury sufficient under Article III. *Id.*; *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037 (9th Cir. 2017). In making those determinations, the Ninth Circuit has considered "both history and the judgment of [the legislature]." *Van Patten*, 847 F.3d at 1042-43; *Eichenberger*, 876 F.3d at 982. The Ninth Circuit has evaluated whether the relevant statute "establishes [a] substantive right," and, if so, whether every violation of the statute "presents the precise harm and infringes the same [substantive] interests [the legislature] sought to protect by enacting the [statute]." *Van Patten*, 847 F.3d at 1043; *Eichenberger*, 876 F.3d at 984 (internal quotation marks, alterations and citation omitted).

On its face, Cal. Bus. & Prof. Code § 17529.5 resembles the substantive protections of the TCPA and the VPPA, considered respectively in *Eichenberger* and *Van Patten*, more than the procedural protections of the Fair Credit Reporting Act (FCRA) considered in *Spokeo.* The FCRA "requires consumer reporting agencies to 'follow reasonable procedures to assure maximum possible accuracy of' consumer reports, § 1681e(b); to notify providers and users of consumer information of their responsibilities under the Act, § 1681e(d); to limit the circumstances in which such agencies provide consumer reports 'for employment purposes,' § 1681b(b)(1); and to post toll-free numbers for consumers to request reports, § 1681j(a)." *Spokeo*, 136 S. Ct. 1540, 1545 (2016) *as revised* (May 24, 2016). Those requirements are procedural on their face. By contrast, Cal. Bus. & Prof. Code §§ 17529.5(a)(1)-(2) prohibit the transmission of "(1) [an] e-mail advertisement [that] contains or is accompanied by a third-party's domain name without the

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV18-04100 JAK (AGRx) | Date | November 5, 2018 |
| Title | William G. Silverstein v. Keynetics, Inc., et al. | | |

permission of the third party"; and "(2) [an] e-mail advertisement [that] contains or is accompanied by falsified, misrepresented, or forged header information." Neither of these requirements is procedural. Together they establish substantive prohibitions on the transmissions of email with certain characteristics.

Cal. Bus. & Prof. Code § 17529 also sets forth the findings of the Legislature in support of the provisions that follow, including those that underlie this action. The legislative findings include:

(a) Roughly 40 percent of all e-mail traffic in the United States is comprised of unsolicited commercial e-mail advertisements (hereafter spam) and industry experts predict that by the end of 2003 half of all e-mail traffic will be comprised of spam.

(b) The increase in spam is not only an annoyance but is also an increasing drain on corporate budgets and possibly a threat to the continued usefulness of the most successful tool of the computer age.

(c) Complaints from irate business and home-computer users regarding spam have skyrocketed, and polls have reported that 74 percent of respondents favor making mass spamming illegal and only 12 percent are opposed, and that 80 percent of respondents consider spam very annoying.

(d) According to Ferris Research Inc., a San Francisco consulting group, spam will cost United States organizations more than ten billion dollars ($10,000,000,000) this year, including lost productivity and the additional equipment, software, and manpower needed to combat the problem. California is 12 percent of the United States population with an emphasis on technology business, and it is therefore estimated that spam costs California organizations well over 1.2 billion dollars ($1,200,000,000).

(e) Like junk faxes, spam imposes a cost on users, using up valuable storage space in e-mail inboxes, as well as costly computer band width, and on networks and the computer servers that power them, and discourages people from using e-mail.

(f) Spam filters have not proven effective.

(g) Like traditional paper "junk" mail, spam can be annoying and waste time, but it also causes many additional problems because it is easy and inexpensive to create, but difficult and costly to eliminate.

(h) The "cost shifting" from deceptive spammers to Internet business and e-mail users has been likened to sending junk mail with postage due or making telemarketing calls to someone's pay-per-minute cellular phone.

(i) Many spammers have become so adept at masking their tracks that they are rarely found, and are so technologically sophisticated that they can adjust their systems to counter special filters and other barriers against spam and can even electronically commandeer unprotected computers, turning them into spam-launching weapons of mass production.

(j) There is a need to regulate the advertisers who use spam, as well as the actual spammers, because the actual spammers can be difficult to track down due to some return addresses that show up on the display as "unknown" and many others being obvious fakes and they are often located offshore.

(k) The true beneficiaries of spam are the advertisers who benefit from the marketing derived from the advertisements.

(l) In addition, spam is responsible for virus proliferation that can cause tremendous

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-04100 JAK (AGRx) | Date | November 5, 2018 |
|---|---|---|---|
| Title | William G. Silverstein v. Keynetics, Inc., et al. | | |

> damage both to individual computers and to business systems.
> (m) Because of the above problems, it is necessary that spam be prohibited and that commercial advertising e-mails be regulated as set forth in this article.

Cal. Bus. & Prof. Code § 17529.

The legislative findings support the conclusion that Cal. Bus. & Prof. Code § 17529.5 codifies a substantive right to be protected from spam, and that a person who is the subject of a violation of that right sustains injuries including lost productivity and resources, annoyance, consumption of valuable digital storage space and financial costs. Furthermore, the statute protects interests and prohibits behavior that are similar to those at issue in actions for nuisance and fraud. Such claims have long been deemed viable and justiciable. Further, "the Supreme Court observed that 'it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit,' not that [the legislature] may recognize a de facto intangible harm only when its statute exactly tracks the common law." *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1115 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 931 (2018) (citation omitted); *see also id.* ("Even if there are differences between [the statute]'s cause of action and those recognized at common law, the relevant point is that [the legislature] has chosen to protect against a harm that is at least closely similar in kind to others that have traditionally served as the basis for lawsuit.").

Like the VPPA and the TCPA, Cal. Bus. & Prof. Code § 17529.5 "identifies a substantive right . . . that suffers *any time*" a prohibited spam message is transmitted. *Eichenberger*, 876 F.3d at 983. "As a result, every [Cal. Bus. & Prof. Code § 17529.5] violation presents the precise harm and infringes the same . . . interests [the legislature] sought to protect by enacting the [statute]." *Id.* (quoting *Van Patten*, 847 F.3d at 1043) (internal quotation marks and alterations omitted). Thus, Plaintiff's allegation that he suffered violations of his statutory rights pursuant to Cal. Bus. & Prof. Code § 17529.5 suffices to satisfy the concreteness requirement of Article III standing.

Even if Cal. Bus. & Prof. Code § 17529.5 were deemed to codify a procedural right, its violation here would be sufficient to establish Article III standing. "[A]n alleged procedural violation of a statute can by itself manifest concrete injury where [the legislature] conferred the procedural right to protect a plaintiff's concrete interests and where the procedural violation presents 'a risk of real harm' to that concrete interest." *Spokeo*, 867 F.3d at 1113 (alterations and citation omitted). In evaluating a claim of harm from a procedural violation, courts in the Ninth Circuit "ask: (1) whether the statutory provisions at issue were established to protect [the plaintiff's] concrete interests (as opposed to purely procedural rights), and if so, (2) whether the specific procedural violations alleged in this case actually harm, or present a material risk of harm to, such interests." *Id.*

As to the first factor, Cal. Bus. & Prof. Code § 17529.5 was designed to protect a concrete interest of Plaintiff's and people similarly situated. As with the FCRA, "given the ubiquity and importance of [e-mail] in modern life . . . the real-world implications of [the proliferation of spam] seem patent on their face." *Spokeo*, 867 F.3d at 1114; *see also* Cal. Bus. & Prof. Code § 17529(b). The legislative record includes a detailed statement of the ways in which spam messages harm e-mail users, businesses and electronic mail service providers. *See* Cal. Bus. & Prof. Code § 17529; *Spokeo*, 867 F.3d at 1114. Accordingly, "[i]n this context, it makes sense that [the legislature] might choose to protect against such harms without requiring any additional showing of injury." *Spokeo*, 867 F.3d at 1114. As with the FCRA, "the interests

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-04100 JAK (AGRx) | Date | November 5, 2018 |
|---|---|---|---|
| Title | William G. Silverstein v. Keynetics, Inc., et al. | | |

that [Cal. Bus. & Prof. Code § 17529.5] protects also resemble other . . . interests that have long been protected in the law." *See id.* Thus the judgment of the Legislature and historical practice show that Cal. Bus. & Prof. Code § 17529.5 was designed to protect a concrete interest of Plaintiff.

The alleged violations also present at least a material risk of harm to the concrete interests protected by the statute. To meet this factor, Plaintiff "must allege more than a bare procedural violation of the statute that is 'divorced from' the real harms that [the statute] is designed to prevent." *Id.* at 1115. Plaintiff alleges that he has received 73 spam messages from affiliates of Defendants. The legislative findings of Cal. Bus. & Prof. Code § 17529 include that the statute was designed to address the harms of lost productivity and resources, annoyances to recipients, consumption of valuable digital storage space and attendant financial burdens, among others. The violations alleged by Plaintiff are not "divorced from" those harms. Rather, the violations alleged present at least a material risk of harm to these concrete interests. Thus, even if Cal. Bus. & Prof. Code § 17529.5 were deemed to codify a procedural rather than substantive right, the concreteness requirement of Article III standing would be established.

This determination is consistent with prior decisions by the Ninth Circuit and a district court in a case that presented very similar circumstances. Plaintiff brought an action like this one against Defendants in 2016 in the Northern District of California. As here, Plaintiff brought claims pursuant to Cal. Bus. & Prof. Code § 17529.5, and made only conclusory allegations of injury based on the receipt of spam messages. Second Amended Complaint, *Silverstein v. Keynetics, Inc.*, No. 4:16-CV-00684-DMR (N.D. Cal. July 11, 2016). The district court ruled on the merits of the case, Plaintiff appealed and the Ninth Circuit ruled on the merits. *Silverstein v. Keynetics, Inc.*, 727 F. App'x 244 (9th Cir. 2018); *Silverstein v. Keynetics, Inc.*, No. 16-CV-00684-DMR, 2016 WL 7475616 (N.D. Cal. Dec. 29, 2016), *aff'd*, 727 F. App'x 244 (9th Cir. 2018). Both of the orders were issued after *Spokeo*.

Because the district court and the Ninth Circuit reached decisions on the merits of Plaintiff's claim, each made an implicit finding of standing under Article III. *See, e.g., Am. Civil Liberties Union of Nevada v. Lomax*, 471 F.3d 1010, 1015 (9th Cir. 2006) (internal quotation marks and citation omitted) ("Standing is an essential component of the case or controversy requirement of Article III, § 2."); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1042 (9th Cir. 2017) ("Before turning to the merits of [Plaintiff's] claim, we first address whether [Plaintiff] has standing under Article III of the Constitution."); *W. Min. Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981) ("[S]tanding and justiciability are limitations upon the exercise of the jurisdiction of the federal courts . . . .").

For the foregoing reasons, Plaintiff has Article III standing to pursue the claims in this action.

## IV.    Conclusion

For the reasons stated in this Order, the Motion is **DENIED**. Defendants shall respond to the First Amended Complaint no later than November 19, 2018.

**IT IS SO ORDERED.**

|  | : |  |
|---|---|---|
| Initials of Preparer | ak | |